CADES SCHUTTE LLP

MILTON M. YASUNAGA        3058-0
ELIJAH YIP                7325-0
ALLISON MIZUO LEE         7619-0
1000 Bishop Street, Suite 1200
Honolulu, HI  96813-4212
Telephone:  (808) 521-9200
FAX:  (808) 521-9210
Email:  myasunaga@cades.com

Attorneys for Plaintiff
SHRED-IT AMERICA, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SHRED-IT AMERICA, INC., | CIVIL NO. 1:10-cv-00547-DAE-KSC |
| Plaintiff. | **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [DOC. 4]; DECLARATION OF MILTON YASUNAGA; EXHIBIT A; SECOND DECLARATION OF JIM RUDYK; EXHIBITS A-C; DECLARATION OF SETSUKO ROBERTS; EXHIBITS A-C; CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.5; CERTIFICATE OF SERVICE** |
| v. | |
| EDWARD MACNAUGHTON; SIH, LLC; and ACCESS INFORMATION MANAGEMENT OF HAWAII, LLC, | |
| Defendants. | |
| | Date:       September 30, 2010 |
| | Time:       9:00 a.m. |
| | Judge:      The Hon. David A. Ezra |

# TABLE OF CONTENTS

**Page**

RECENTLY DISCOVERED FACTS ..................................................................... 2

ARGUMENT

A.   This Court Has Subject Matter Jurisdiction. ........................................ 7

B.   Shred-it Is Not Asking This Court For Any Injunctive
     Relief That Was Not Contemplated By The Parties
     Under The Franchise Agreement. ......................................................... 9

C.   In Enforcement Actions Involving Other SHRED-IT®
     Franchisees, Shred-it Has Been Awarded Injunctive Relief
     Under Similar Circumstances. ........................................................... 10

D.   The Injunctive Relief Sought By Shred-it To Protect Its
     Goodwill, Right Of First Refusal, Trade Secrets, And
     Transfer Of Property Is A Fundamental Component Of
     Franchise Law To Protect A Franchisor From  Irreparable
     Harm. .................................................................................................. 11

E.   Shred-it Is Likely To Prevail On The Merits Of Its Claims. ............. 19

     1.   Defendants Have Misappropriated Shred-it's
          Trade Secrets. .......................................................................... 19

     2.   Shred-it Is Likely To Succeed On The Merits Of Its
          Breach Of Contract and Interference With Contract
          Claims. ..................................................................................... 20

     3.   Shred-it Is Likely To Succeed On The Merits Of
          Its Lanham Act Claims. ............................................................ 21

F.   Public Policy Weighs Heavily In Favor Of Injunctive Relief. ........... 21

G.   Shred-it Is Prepared To Post An Appropriate Bond. .......................... 22

## TABLE OF AUTHORITIES

Page

### CASES

Bad Ass Coffee Co. of Haw., Inc. v. JH Enterp., L.L.C.,
    636 F. Supp. 2d 1237 (D. Utah 2009).......................................... 17

Cottman Transmission Systems, Inc. v. Melody,
    851 F. Supp. 660 (E.D. Penn. 1994) ..................................... 17, 18

Days Inns Worldwide, Inc. v. Patel, 2005 U.S. Dist. LEXIS 43234
    (S.D. Cal. 2005) ................................................................... 18

Domino's Pizza, Inc. v. El-Tan, Inc., 1995 WL 367893
    (N.D. Okla. Apr. 28, 1995) .................................................. 14

Dunkin' Donuts Inc. v. Taseski, 47 F. Supp. 2d 867
    (E.D. Mich. 1999) ............................................................... 15

Fargo Biltmore Motor Hotel Corp. v. Best W. Int'l, Inc.,
    742 F.2d 459 (8th Cir. 1984)................................................. 22

Gallagher Benefit Servs. v. De La Torre, 283 Fed. Appx. 543, 545
    (9th Cir. 2008)..................................................................... 17

Grupo Condumex S.A. v. SPX Corp., 227 F. Supp. 2d 755
    (N.D. Ohio 2002) ................................................................ 16

Jackson Hewitt Inc. v. Childress, 2008 U.S. Dist. LEXIS 24460
    (D.N.J 2008)................................................................... 17, 18

Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc., 834 F. Supp. 683
    (D.N.J. 1993)....................................................................... 14

Johnson v. Shred-it America, Inc., Case No. 65 114 E 00298.................. 12, 13, 18

Johnson v. Shred-it America, Inc., supr ; Nike, Inc. v. McCarthy,
    379 F.3d 576 (9th Cir. 2004)................................................. 18

# TABLE OF AUTHORITIES

Page

McCart v. H&R Block, Inc., 470 N.E.2d 756 (Ind. Ct. App. 1984) ...................... 14

Medi-Weightloss Franchising USA, LLC v. Sadek,
 2010 U.S. Dist. LEXIS 42264 (M.D. Fla. 2010) .......................... 17

Merrill Lynch, Pierce, Fenner & Smith Inc. v. McClafferty,
 287 F. Supp. 2d 1244 (D. Haw. 2003) ................................... 16

National Sch. Reporting Serv., Inc. v. National Sch.of Calif., Inc.,
 967 F. Supp. 127 (S.D.N.Y. 1997)................................... 22

Paisa, Inc. v. N&G Auto, Inc., 928 F. Supp. 1009 (C.D. Cal. 1996)...................... 18

Petland, Inc. v. Hendrix, 2004 WL 3406089 )
 (S.D. Ohio Sept. 14, 2004 ................................................... 20

Prudence Corp. v. Shred-it America, Inc., 2010 WL 582597
 (9th Cir. Feb. 11, 2010)..................................................... 23

Quizno's, 2002 WL 1012997................................................................... 18

Rita's Water Ice, 1996 WL 165518 ......................................................... 20

Rita's Water Ice, 1996 WL 165518 (E.D. Pa. April 8, 1996) ................................. 18

Sea-Roy, Corp. vs. Parts R Parts, Inc., 907 F. Supp. 921
 (M.D.N.C. 1995)............................................................ 18

Service Master Residential/Commercial Servs. L.P. v.
 Westchester Cleaning Servs. Inc., 2001 WL 396520
 (S.D.N.Y. Apr. 19, 2001)................................................. 14

ServiceMaster (Westchester Cleaning), 2001 WL 396520..................................... 18

Sherwood Ford, Inc. v. Ford Motor Co., 860 F. Supp. 659
 (E.D. Mo. 1994) ............................................................. 15

# TABLE OF AUTHORITIES

**Page**

Sir Speedy, Inc. v. Morse, 256 B.R. 657 (D. Mass. 2000).......................................... 13

Sparks Tune-up Centers, Inc. v. White, 1989 WL 41321
   (E.D. Pa. April 18, 1989) .............................................................. 14

Sunward Electronics, Inc. v. McDonald, 362 F.3d 17 (2d Cir. 2004) .................... 18

The 7's Enters. v. Rosario, 111 Haw. 484 (2006) ..................................................... 17

Two Men and a Truck Int'l Inc. v. Two Men and
   a Truck Kalamazoo, Inc., 955 F. Supp. 784
   (W.D. Mich. 1997) ................................................................... 22

UARCO Inc. v. Lam, 18 F. Supp. 2d 1116 (D. Haw. 1998)................................. 17

## STATUTES

15 U.S.C. § 1 ..................................................................................... 10

15 U.S.C. § 18 ................................................................................... 10

15 U.S.C. § 26 ................................................................................... 10

15 U.S.C. §§ 1114(1)........................................................................ 10

15 U.S.C. § 1125(a)........................................................................... 10

28 U.S.C. § 1331 ................................................................................ 9

H.R.S. § 482E-6................................................................................ 12, 22

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION [DOC. 4]

In opposing Shred-it's motion for preliminary injunction, Defendants attempt to overcome the overwhelming evidence that they breached the Franchise Agreement (the "Agreement"), squandered Shred-it's goodwill, misappropriated its trade secrets, and infringed on its trademarks, by contending, for the most part, that the Agreement is not valid under Hawaii law. Defendants use the Agreement as a sword and a shield. On the one hand, for 12 years, they took advantage of Shred-it's system, support, trademark, brand, reputation, customers, goodwill, and for which they paid fees and royalties, without ever contesting the validity of the Agreement. On the other hand, Defendants now seek to disavow the Agreement by arguing that they have no post-termination obligations because the Agreement is and always was invalid. Defendants' position is untenable, fundamentally inequitable, and only furthers the irreparable harm Shred-it is suffering as a result of Defendants' misconduct.

Since filing for injunctive relief, although Defendants refused to engage in limited expedited discovery, the evidence of misconduct by Defendants causing irreparable harm in derogation of Shred-it's legal and contractual rights continues to mount.

## <u>RECENTLY DISCOVERED FACTS</u>

Given the abruptness by which Defendants notified Shred-it on September 22, 2010, that they unlawfully consummated the sale of Shred-it's franchise and Shred-it's commencement of this litigation, the discovery of evidence of Defendants' misconduct is ongoing.

For instance, Shred-it learned that Defendants sent a letter to Shred-it's law firm in this litigation, Cades Shutte, LLP (and presumably numerous other customers), concerning the purported sale of Shred-it's franchise to Defendant AIMH. In that letter, which is signed by MacNaughton on behalf of AIMH states, in part, as follows:

**Access Information Management of Hawaii, LLC**          **Shred-it Hawaii**

As of September 21, 2010, Shred-it Hawaii has ceased all operations in Hawaii and we are excited to announce that Access Information Management of Hawaii, LLC – which is part of the Access Information Management ("Access") family of companies – will now service all your secure document destruction needs. Our biggest priority is to make this a seamless transition for all clients; rest assured that you will continue to receive the same heroic service from an outstanding local team. Effective immediately, you will notice that all "Shred-it" markings have been removed and replaced by new branding and everything will reflect that Access Information Management of Hawaii, LLC is now meeting your needs.

**EFFECTIVE IMMEDIATELY: New contact information for all orders and correspondence**

Phone: 808-673-3200          Fax: 808-673-3203          Email: Hawaii@accesscorp.com

We will continue to provide secure, mobile and plant based document destruction services to clients from facilities in Aiea, Kona and Wailuku. In addition to serving all existing client document destruction needs, Access offers a full-range of records and information management (RIM) services including: records storage and management, data protection and document scanning and Web-based hosting services.

(Roberts Decl. ¶ 3, Ex. A).

With their solicitation letter, Defendants further included an assignment purporting to assign the customer to AIMH:

2

**Shred-it Hawai'i, LLC**
**91-238 Kauhi St.**
**Kapolei, HI 96707**

RE: Assignment of Shredding Services Contract

The assets of SIH, LLC dba "Shred-it Hawaii" ("SIH") has been acquired by Access Information Management of Hawaii, LLC ("AIMH") effective September 21, 2010. As part of the acquisition, SIH has assigned all of its customer contracts to AIMH. Your existing contract will remain in effect with the same terms and conditions, however, as of September 22nd, 2010, it will be AIMH providing the service. The same SIH employees and management team will be staying on to ensure a professional and seamless transition. In order to make sure there is no interruption in your shredding service, we ask that you sign below acknowledging and consenting to the assignment.

Very Sincerely,

Ed MacNaughton

(*Id.*, Ex. B).  Worse yet, Defendants used AIMH personnel to service customers in possession of Shred-it's shredding consoles, which bear the SHRED-IT® mark:



(*Id.*, ¶ 4, Ex. C).

Given this misleading conduct using Shred-it's name, it is not surprising that Shred-it customers have suffered actual confusion concerning this situation.  The following is an example of the customer confusion that has been created by Defendants' unlawful activities:

4

**To:** honolulucustomerinquiries@shredit.com; info@shredit.com
**Subject:** Customer Request: Website - Other - Honolulu

### CUSTOMER REQUEST - IMMEDIATE ACTION REQUIRED

| | |
|---|---|
| Name: | Rosco Doolin |
| Organization: | Persis Corporation |
| Phone: | 808-599-8061 |
| Email: | rdoolin@persis.com |
| Zip/Postal Code: | 96813 |
| Subject: | Other |

**Comments:**
Was Shred-It accquired by Access? An Access File Minders
employee came to our office stating the above fact and I
would like to confirm this.

This request was received from an existing Shred-it customer.
Please follow up on this information and report your results in the Lead Management Tool
at http://www.leadtracking.securit.com.
Should you have any questions, please direct your inquiry to info@shredit.com

(Rudyk Decl. II ¶ 2, Ex. A).

Defendants attempt to distract the Court from this compelling evidence of misappropriation of trade secrets, breach of the Agreement and trademark infringement by arguing that the Agreement is void. Putting aside that SIH and MacNaughton took advantage of the Agreement for 12 years, Shred-it has retrieved an e-mail from MacNaughton that belies his position here. When MacNaughton and SIH were in discussions to sell their business back to Shred-it and Shred-it was conducting due diligence into that acquisition, Shred-it saw references to Access, and queried "Who is 'Access'?". In response, MacNaughton replied:

5

<u>ALL ANSWERS ARE IN RED</u>

<u>General Comments / Questions</u>
1. Who is "Access"?  Ed referred to them in his original email.
   o Landlord and competitor of ours who was interested in purchasing the branch only to de-brand and change name to Access – we did not treat as legitimate buyer because they did not qualify as such
   o Access is a Records Storage and document destruction company.  They are the largest records storage company in Hawaii and second to Shred-it Hawaii in document destruction.

(*Id.*, ¶ 3, Ex. B).

MacNaughton's admission is a smoking gun in several respects.  Contrary to his position here, MacNaughton tacitly acknowledges that the Agreement imposes restrictions on the sale of SIH's business and qualifications on buyers.  The statement further recognizes that Shred-it's approval is required before any such sale.  This admission also conflicts with Defendants' position that the sale of SIH to AIMH is permissible because the Agreement is void.

Finally, in yet another e-mail, MacNaughton agrees with Shred-it that it need not register the Agreement because he was in discussions to sell back his franchise to Shred-it:

6

**From:** Ed MacNaughton [mailto:honolulugm@shredit.com]
**Sent:** Monday, March 08, 2010 7:56 PM
**To:** Brenda Frank
**Subject:** RE: Franchise Agreement Extension

Brenda,

Thank you for the quick note.  I agree that this is best for all parties concerned.

**From:** Brenda Frank [mailto:brenda.frank@shredit.com]
**Sent:** Monday, March 08, 2010 2:54 PM
**To:** Andre Champagne; Honolulu GM
**Cc:** Vince De Palma
**Subject:** RE: Franchise Agreement Extension

Hi Ed:  Nice meeting you today.  I am looking forward to working with you moving forward.  Pursuant to our recent conversation, I wanted to confirm that Shred-it will not register our FDD in Hawaii at this time, based on our intention to pursue a mutually agreeable purchase of your franchise business.  Of course, registration will be sought if our mutual efforts don't work out.

Speak with you soon.

Brenda Frank
General Counsel, EVP of HR & Franchise Relations

**Shred-it International, Inc.**
2794 South Sheridan Way
Oakville, ON
L6J 7T4

T: 905.491.2470
C: 289.937.1016
E: brenda.frank@shredit.com

**Making sure it's secure.**

(*Id.*, ¶ 4, Ex. C).

Shred-it has overwhelmingly demonstrated that an injunction is necessary to protect Shred-it's trade secrets, customer goodwill, trademarks, and post-termination rights under the Agreement.

## ARGUMENT

### A.    This Court Has Subject Matter Jurisdiction.

28 U.S.C. § 1331 confers original jurisdiction upon this Court for claims arising under the laws of the United States.  Despite Shred-it's pleading of claims

arising under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and 1125(c), Defendants contend this Court lacks subject matter jurisdiction.

As set forth above, Shred-it has uncovered *direct evidence* of Lanham Act violations.  Moreover, Shred-it's Lanham Act claim also encompasses an action under 15 U.S.C. § 1125(a), which provides relief to Shred-it for Defendants' false representations, false descriptions, and/or false designations of origin of their services in violation of 15 U.S.C. § 1125(a).  Finally, Shred-it has filed an Amended Complaint to assert additional federal claims alleging an antitrust lawsuit under 15 U.S.C. § 26, for violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.  This Court clearly has federal question jurisdiction.

Defendants request that this Court decline to exercise supplemental jurisdiction over Shred-it's state law claims.  Shred-it's state law claims, however, do not allege a novel or complex issue of state law, nor do they predominate over the federal claim; to the contrary, insofar as it relates to the Agreement, California law governs, which places this Court in the best position to adjudicate the dispute. Defendants have not served their lawsuit or taken any action in that regard. Defendants have appeared in this case, this Court has already taken certain actions, and the overwhelming federal public policy interests place this Court is in the best position to adjudicate this dispute.

8

**B.    Shred-it Is Not Asking This Court For Any Injunctive Relief That Was Not Contemplated By The Parties Under The Franchise Agreement.**

Upon entering into the Agreement, these sophisticated parties clearly understood what implications and remedies would arise upon termination of the franchise relationship.  In the exchange of promises, Shred-it broadly provided SIH and MacNaughton with the keys to its business; it allowed use of its brand, reputation, methods of doing business, marketing, training, support resources, truck technology, customer lists, and goodwill, among other things.  MacNaughton and SIH honored the Agreement and paid royalties and fees to Shred-it for these benefits for 12 years, until September 22, 2010.  Shred-it is simply asking for the relief and remedy that the parties contemplated at the outset of the franchise relationship:  an injunction enforcing Shred-it's post-termination rights.

More specifically, the parties agreed, "Franchisee acknowledges and agrees that they cannot sell trucks and/or consoles outside the system because of the "proprietary nature" of shredders and consoles."  (Rudyk Decl., Ex. A, at p. 19).  Numerous other provisions, as previously cited by Shred-it, also protect the franchisor and its system, trademarks, goodwill, know-how, and so forth, both during and after termination of the Agreement. (*Id.*)

MacNaughton and SIH also knew and expressly agreed that Shred-it could enforce those restrictions by going to court to obtain injunctive relief.   (*Id*. at pp. 30,

9

31 ("**Injunctive relief.**   Nothing herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct . . . *** Franchisor may at its option institute an action or actions for temporary, preliminary, or permanent injunctive relief or seeking any other equitable relief against Franchisee in addition to the other rights and remedies provided herein.")

The Hawaii Franchise Investment Law, upon which Defendants rely, recognizes that a franchisor is not required to allow a franchise to turn its business over to a competitor.   In H.R.S. § 482E-6, the HFIL requires and defines "good cause" for the franchisor to refuse to permit such a transfer of ownership.   And the statutory "good cause" list specifically provides that the franchisor need not allow transfer if "the proposed transferee or any affiliated person of the proposed **transferee is a competitor of the franchisor**."   H.R.S. § 482E-6(2)(I)(ii)(emphasis added.).

### C.   In Enforcement Actions Involving Other SHRED-IT® Franchisees, Shred-it Has Been Awarded Injunctive Relief Under Similar Circumstances.

In *Johnson v. Shred-it America, Inc.,* Case No. 65 114 E 00298 08, American Arbitration Association (April 30, 2009), an arbitrator awarded Shred-it injunctive relief under similar circumstances.   (Yasunaga Decl., Ex. A).   There, a former SHRED-IT® franchisee abandoned its franchise and began operation under a different business name.   Shred-it moved for injunctive relief to enforce its post-

10

termination rights.    The arbitrator granted Shred-it broad relief, including prohibiting the former franchisee from using any of Shred-it's confidential information; soliciting, servicing, or diverting any of its customers; providing competitive services; using any of Shred-it equipment, trademarks, or the like; and ordering the franchisee to return all such property to Shred-it.  (*Id.*, Ex. A, at p. 30).

### D.    The Injunctive Relief Sought By Shred-it To Protect Its Goodwill, Right Of First Refusal, Trade Secrets, And Transfer Of Property Is A Fundamental Component Of Franchise Law To Protect A Franchisor From  Irreparable Harm.

Post-termination covenants are enforced in franchising "because the very purpose of the covenant[s] is to govern the relationship between the parties after the demise of the underlying contract."  *Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 660 (D. Mass. 2000).

 **Goodwill.**   One critical function of post-termination contractual promises in franchising is to protect the goodwill of the franchisor and its remaining franchisees. Here, for example, Shred-it not only licenses franchisees to use the SHRED-IT® trademarks, it licenses, trains, and supports them in the SHRED-IT® way of doing business.   In effect, Shred-it rents to its franchisees, *for the period of the franchise relationship*, the right to use the SHRED-IT® marks and system to build goodwill at a particular location.

That the right to profit from the existing and potential customer relationships remains with the franchisor is integral to the concept of franchising.  In the words of one court:  "One can view a franchise agreement, in part, as a conveyance of the franchisor's good will to the franchisee for the length of the franchise.  When the franchise terminates, the good will is, metaphysically, reconveyed to the franchisor." *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.* 834 F. Supp. 683, 691 (D.N.J. 1993).[1]

**Right of Purchase For "Adjusted Going Concern".**  After the termination of the Agreement, Section XIV.J grants Shred-it the right to acquire the assets of the franchised business at "Adjusted Going Concern Value" and, along with the Mandatory Addendum to Lease Agreement, obligates SIH to assign the lease used in connection with its former SHRED-IT® business to Shred-it.  (Rudyk Decl., Ex. A, at p. 23).  The Agreement provides Shred-it with the opportunity to maintain

---

[1] *See also Domino's Pizza, Inc. v. El-Tan, Inc.* 1995 WL 367893 (N.D. Okla. Apr. 28, 1995) (granting injunction to protect franchisor against irreparable loss of goodwill); *Service Master Residential/Commercial Servs. L.P. v. Westchester Cleaning Servs. Inc.* 2001 WL 396520 (S.D.N.Y. Apr. 19, 2001) (franchisor has a legitimate interest in protecting its know-how, when there is a "recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the goodwill of the franchisor"); *McCart v. H&R Block, Inc.*, 470 N.E.2d 756, 763 (Ind. Ct. App. 1984) (goodwill of customers' affiliation with a franchisor's particular business is a "protectible interest")' *Jiffy Lube*, 834 F. Supp. at 691 (franchisor "has a valid interest in protecting the good will it has developed over the years"); *Economou v. Physicians Weight Loss Centers*, 756.F. Supp. 1024, 1032 (N.D. Ohio 1991) (failure to grant injunction would result in harm to franchisor's goodwill and customer confusion); *Sparks Tune-up Centers, Inc. v. White*, 1989 WL 41321, at * 3 (E.D. Pa. April 18, 1989) (permitting the franchisee to continue a competing business at his current location would result in interference with customer relationships and cause irreparable harm); *Brenco*, 2003 WL 21659422, at *18 (one of the most important interests warranting enforcement is franchisor's goodwill).

that continuity of presence both during the term of the agreement (through Shred-it's rights of consent to sale and first refusal in Sections XII.B and XII.D) and after the agreement has terminated (through Shred-it's right to purchase assets in Section XIV.J).   A sale of the SIH's business assets to a competitor deprives Shred-it of its right to maintain that essential continuity of presence and makes the injury irreparable by delivering the goodwill developed by its former SHRED-IT® business to a competitor.

More specifically, courts have found irreparable harm and ordered injunctive relief in cases where terminated franchisees failed to fulfill their contractual commitments to assign the business premises to their former franchisor. *See, e.g., Dunkin' Donuts Inc. v. Taseski*, 47 F. Supp. 2d 867, 878 (E.D. Mich. 1999) (the franchisor "persuasively argued that an ability to preserve the goodwill already accumulated at the [formerly franchised] location would result in irreparable harm to [the franchisor]"); *Dunkin' Donuts Inc. v. Dowco*, Bus. Franchise Guide (CCH) ¶ 11,374 (N.D.N.Y. 1998) (the franchisor "established the element of irreparable harm because it has a legitimate interest in protecting its presence in the [formerly franchised] market, consumer confusion is likely, and [the franchisor] risks losing good will").   Relief can be awarded even after a sale has been consummated.   *See, e.g., Sherwood Ford, Inc. v. Ford Motor Co.,* 860 F. Supp. 659, 663 (E.D. Mo.

13

1994); *Grupo Condumex S.A. v. SPX Corp.,* 227 F. Supp. 2d 755, 760 (N.D. Ohio 2002).

**Proprietary Items.** In addition to protecting goodwill and post-termination rights, a number of aspects of Shred-it's method of doing business are proprietary or confidential, and must be protected as such. SIH and MacNaughton gained access to SHRED-IT's® confidential and proprietary information only by virtue of their status as franchisees. Now they have purported to sell this information to a competitor, and then to assist the competitor to use this information in competition with Shred-it and the other SHRED-IT® franchisees. In accordance with Sections VII, VIII and XIV of the Agreement, Shred-it seeks an order directing Defendants to return all trade secrets and confidential and proprietary materials used in their former SHRED-IT® business to Shred-it. This includes all manuals, consoles, trucks, customer lists, account information and other confidential and proprietary information and materials used in the operation of SIH and MacNaughton's former SHRED-IT® business.

The courts in Hawaii and elsewhere have held that a franchisor's proprietary, confidential, and trade secret information is a protectable interest that is subject to protection through injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. McClafferty*, 287 F. Supp. 2d 1244, 1251 (D. Haw. 2003) (granting TRO requiring the defendants return all records, documents, and/or other

14

types of information pertaining to customers, whether in original, copied, handwritten, computerized (including on computer software, disks, computer hard drive and/or any other type of computer or digital information storage device) or memorialized in any other form); *The 7's Enters. v. Rosario*, 111 Haw. 484, 493 (2006) (affirming injunction and stating that trade secrets, confidential information, or special customer relationships are protectable business interests).[2]

Protected confidential information and trade secrets include customer information and customer lists.  *See UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1126-27  (D. Haw. 1998) (recognizing that a customer list meets the definition of a trade secret and enjoining defendant from contacting, directly or indirectly, any customer solicited, contacted, or otherwise dealt with previously); *Gallagher Benefit Servs. v. De La Torre*, 283 Fed. Appx. 543, 545 (9th Cir. 2008) (holding that customer-related information was a protected trade secret).

---

[2] *See also Cottman Transmission Systems, Inc. v. Melody*, 851 F. Supp. 660, 673 (E.D. Penn. 1994) (applying California law) (enjoining franchisees from, among other things, use of franchisor's proprietary manuals and confidential materials and further ordering franchisees to return all signs, manuals, forms, and proprietary materials to franchisor); *Jackson Hewitt Inc. v. Childress*, 2008 U.S. Dist. LEXIS 24460 * 26-29 (D.N.J 2008) (enforcing post-termination covenants, which included ordering the return of franchisor's trade secrets and confidential and proprietary information); *Medi-Weightloss Franchising USA, LLC v. Sadek*, 2010 U.S. Dist. LEXIS 42264 * 24-27 (M.D. Fla. 2010)  (enjoining former franchisee from, among other things, disclosing or using any of franchisor's confidential information relating to the sources and design of products, materials, supplies, furniture, furnishings and equipment used in the franchised business); *Bad Ass Coffee Co. of Haw., Inc. v. JH Enterp., L.L.C.*, 636 F. Supp. 2d 1237, 1245 (D. Utah 2009) (granting injunction requiring the defendants to return to franchisor all records, data, designs, photographs, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, and equipment related to franchisee's business).

Courts and arbitrators recognize that Shred-it has a legitimate interest in protecting against the diversion of business through the defendants' use of this confidential and/or proprietary information, which numerous courts and arbitrators have recognized.[3]

**Telephone Numbers.** Similarly, courts have consistently upheld post termination provisions that require a terminated franchisee to transfer the telephone numbers and directory listings used in their franchised business to the franchisor.[4]

---

[3] *See, e.g., Johnson v. Shred-it America, Inc.*, *supra*; *Nike, Inc. v. McCarthy,* 379 F.3d 576, 586 (9th Cir. 2004) (explaining that knowledge of confidential information is sufficient to justify enforcement if there is a "substantial risk" that the person will be able to divert all or part of the business); *Pirtek USA, LLC v. Layer*, Bus. Franchise Guide (CCH) ¶ 13,257 (M.D. Fla. 2005) (franchisor had legitimate business interest in protecting its investment in the training it provided to franchisee concerning a business with respect to which franchisee had no prior experience or knowledge); *ServiceMaster (Westchester Cleaning)*, 2001 WL 396520 ("Defendant cannot reasonably dispute that when Plaintiff provided it with training and confidential manuals, Plaintiff extended to Defendant the knowledge and ability to launch a restoration cleaning business and that Defendant used those tools to operate its business for fifteen years."); *Rita's Water Ice,* 1996 WL 165518 (E.D. Pa. April 8, 1996) (franchisor has a protectable interest given that it made expenditures for market development and training, granted an exclusive sales area, and gave franchisee permission to use its name); *Quizno's*, 2002 WL 1012997 (franchisor has an interest in "protecting itself from former franchisees' opening sandwich shops that serve food closely resembling Quizno's sandwiches" and concluding that it is not unreasonable to prohibit a former franchisee "from operating a sandwich shop using the same format, signage, and recipes he used as a Quizno's franchisee").

[4] *See Paisa, Inc. v. N&G Auto, Inc.*, 928 F. Supp. 1009 (C.D. Cal. 1996) (terminated franchisee compelled to assign all telephone numbers associated with the franchisor's trademarks to franchisor); *Jackson Hewitt Inc. v. Childress*, 2008 U.S. Dist. LEXIS 24460 * 26-29 (D.N.J 2008) (directing transfer of telephone numbers and directory listings used in the former franchisee's business); *Cottman Transmission Systems, Inc. v. Melody*, 851 F. Supp. 660, 673 (E.D. Penn. 1994) (applying California law) (enjoining former franchisee from continuing to use telephone numbers associated with franchisor's trademarks); *Days Inns Worldwide, Inc. v. Patel*, 2005 U.S. Dist. LEXIS 43234 (S.D. Cal. 2005) (terminated franchisee enjoined from using any telephone numbers or telephone listings formerly associated with franchisee); *Sea-Roy, Corp. vs.*

16

In this instance, both Section XIV.I of the Agreement and the Telephone Assignment Agreement in Attachment F to the Agreement require SIH and MacNaughton to transfer all telephone numbers and directory listings to Shred-it. (Rudyk Decl., Ex. A, at p. 24).

**Impact on Franchise System.** For a small franchisor like Shred-it, post-termination promises are literally the glue that holds the system together. If SIH and MacNaughton are allowed to sell out to a competitor following termination of the franchise, Defendants will likely continue to maintain the same customer relationships it had with the SHRED-IT® franchisee and will continue to enjoy the goodwill developed using the SHRED-IT® marks and system.

As one court explained, if a former franchisee is allowed to continue to operate in violation of post-termination obligations, then "other franchise holders will see that they may reap the benefit of the franchise agreement including the use of [the franchisor's] registered marks, goodwill and reputation, and, later at their election and with little or no cost, begin to compete with the plaintiff as if they had never signed a franchise agreement." *ServiceMaster Residential/Commercial Servs., L.P. v. Proctor*, Bus. Franchise Guide (CCH) ¶ 12,251 (D. Neb. Oct. 31,

---

*Parts R Parts, Inc.*, 907 F. Supp. 921 (M.D.N.C. 1995); *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) (enjoining franchisee from continuing to use telephone numbers after termination).

2001); *see also Petland, Inc. v. Hendrix*, 2004 WL 3406089) (S.D. Ohio Sept. 14, 2004) ("Petland's failure to enforce its non-competition covenant would undermine its credibility with its franchisees, the relationships upon which its entire business model exists").

The court in *Rita's Water Ice*, 1996 WL 165518 at *5, recognized the potential harm to the franchisor's existing franchise relationships if post-termination obligations are not enforced.

> Furthermore, the franchise agreements at issue are similar to the agreement signed with other franchisees. If plaintiff is unable to enforce this restrictive covenant against these defendants, the value of all its franchises are lowered. Other franchisees might violate their franchise agreements in similar ways and use [Franchisor's] goodwill to establish competing businesses.

*Id.* 28,140; s*ee also ATL Int'l, Inc. v. Baradar*, Bus Franchise Guide (CCH) ¶ 11,345 (D. Md. 1997) ("I have little doubt that my failure to grant the injunction here might unravel the franchise system.")

The same rationale applies here. If the Court were to permit the defendants' continued theft of SHRED-IT's® goodwill and business system, the post-termination obligations contained in the Agreement would be rendered worthless and Shred-it would lose the benefit of its bargain. Other franchisees will try to do the same thing. Additionally, those other franchisees' investments in their

18

SHRED-IT® franchise will be devalued.  Shred-it will suffer irreparable harm in the degradation of its relationship with existing franchisees.

### E.   Shred-it Is Likely To Prevail On The Merits Of Its Claims.

#### 1.   *Defendants Have Misappropriated Shred-it's Trade Secrets.*

Defendants miss the point that the identity of the customers is only the beginning of the trade secret analysis.  Here, the confidential compilation of customer information in Shred-it's proprietary SHRED-COM database includes the customer name, contact information, address, pricing, service history, routing information, customer service issues, level of service, payment details, and other confidential details regarding the customer.  (Rudyk Decl. ¶ 17).

Defendants further contend they have not misappropriated any trade secrets because they only transferred an Excel spreadsheet containing the information, not the proprietary database.  As elaborated above, the *information* is precisely the trade secret that requires protection from Defendants' unlawful misappropriation.

The same analysis is true for Shred-it's truck technology.  Although Defendants baldly assert that Shred-it's trucks are not proprietary, Shred-it has proven otherwise.  Shred-it's trucks are manufactured and sold *only* to its corporate operations and franchisees.  The parties agreed to precisely this point in the Agreement.  (Rudyk Decl., Ex. A, at p. 19).

Under these circumstances, Hawaii law provides a statutory right to injunctive relief upon a showing of misappropriation of trade secrets.  *See* H.R.S. § 482B-3.

      **2.**       ***Shred-it Is Likely To Succeed On The Merits Of Its Breach Of Contract and Interference With Contract Claims.***

It is undisputed that at all times between July 26, 1998 and September 22, 2010, SIH and MacNaughton acted at all times like a franchisee and benefited from the Agreement.  *See Fargo Biltmore Motor Hotel Corp. v. Best W. Int'l, Inc.,* 742 F.2d 459, 462 (8th Cir. 1984) (finding that equitable estoppel precluded a franchisee from contesting the validity of a franchise agreement); *Two Men and a Truck Int'l Inc. v. Two Men and a Truck Kalamazoo, Inc.,* 955 F. Supp. 784, 787 (W.D. Mich. 1997) (same); *National Sch. Reporting Serv., Inc. v. National Sch.of Calif., Inc.,* 967 F. Supp. 127, 130 (S.D.N.Y. 1997) (holding that estoppel precludes a franchisee from contesting the validity of the franchise agreement "where a franchisee has gained knowledge that a franchise agreement is potentially unlawful, but does not rescind the agreement at the time of gaining that knowledge and continues with the 'franchise' relationship.").

Aside from representing a classic waiver and equitable basis for estoppel, MacNaughton admits that upon expiration in 2008, the Agreement was extended on an "at will" basis.  (MacNaughton Decl. ¶ 17).  If, as MacNaughton asserts, the

20

Agreement was being extended on an "at will" basis, then the post-termination obligations in the Agreement also necessarily continued on an "at will" basis as well.  MacNaughton cannot use the Agreement as both a sword and a shield; on the one hand contending that the Agreement was valid insofar as it served his purposes in continuing to operate the SHRED-IT® franchise, yet invalid when Shred-it seeks to enforce its post-termination rights.

Finally, Defendants argue that the decision in *Prudence Corp. v. Shred-it America, Inc.,* 2010 WL 582597 (9th Cir. Feb. 11, 2010) precludes the relief sought by Shred-it here.  In *Prudence*, however, the court did not rule that the franchise agreement was *invalid* or adjudicate any post-termination relief; it simply ruled that the parties' original franchise agreement continued to apply (in fact, for another ten years) in the absence of a renewal agreement.  The decision is actually supportive of and consistent with Shred-it's position in this case.

### 3. *Shred-it Is Likely To Succeed On The Merits Of Its Lanham Act Claims.*

As elaborated above, Shred-it has already uncovered and presented direct evidence of trademark violations by Defendants, including confusion in the marketplace.  (Rudyk Decl. II, Ex. A).  As such, Shred-it is likely to prevail on the merits of these claims.

### F. Public Policy Weighs Heavily In Favor Of Injunctive Relief.

21

Defendants argue that prohibiting "AIMH from using the property it purchased from SIH would inconvenience hundreds or thousands of former customers of SIH." (Defs' Brief, at p. 37). To the contrary, enforcement of Shred-it's rights under the Agreement to take back the property that was unlawfully transferred would further the public interest. Shred-it remains ready, willing and able to service its customers in Hawaii, just as it does around the world every day.

Furthermore, Defendants have thrust confusion upon the public, sent cryptic letters using the SHRED-IT® name, attempted to improperly solicit assignments of customer contracts, and misrepresented or omitted facts to customers. When these customers contracted for service, they did so knowing that the reputation, brand and good will of the SHRED-IT® name was behind that service.

### G.      Shred-it Is Prepared To Post An Appropriate Bond.

Shred-it is prepared to immediately post a cash bond pursuant to Rule 65(c) in an amount determined appropriate by the Court.

DATED:  Honolulu, Hawaii, September 29, 2010.

CADES SCHUTTE LLP


/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
ELIJAH YIP
ALLISON MIZUO LEE
Attorneys for Plaintiff
SHRED-IT AMERICA, INC.


**ATTORNEYS FOR PLAINTIFF
SHRED-IT AMERICA, INC.**

23